**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **SHARON A. EMERY,** | ) | |
| | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| v. | ) | CIVIL NO. 06-91-P-H |
| | ) | |
| **METROPOLITAN LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

**DECISION AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

There are two issues in this disability benefits appeal. First, what standard of review applies to the decision denying benefits? Second, given that standard of review, is the denial properly supportable? I conclude that a deferential standard of review applies, and that, based upon the administrative record, the denial of benefits was reasoned and supported by substantial evidence and must be affirmed.

**I. FACTS**

The plaintiff, Sharon Emery, began working for Ventiv Health, Inc. as a pharmaceutical sales representative in June 2003. Administrative Record ("R.") 198. Her job included driving to various doctors' offices throughout the state to

present prescription information to clients.  R. 82-83.  She was required to "multi-task" and to interact with others on the phone and in person.  R. 80, 83.

Emery participated in the Ventiv Health, Inc. Employee Welfare Plan (the "Plan"). R. 70.  The defendant, Metropolitan Life Insurance Company ("MetLife"), insured the disability benefits provided by the Plan.  R. 70.  Under the Plan, an employee was "disabled" and entitled to up to 25 weeks of short term benefits if, "due to sickness, pregnancy or accidental injury," she was "receiving Appropriate Care and Treatment from a Doctor on a continuing basis" and was "unable to earn more than 80% of [her] Predisability Earnings at [her] Own Occupation[1] for any employer in [her] Local Economy."  R. 18-19, 26.

Emery submitted an initial claim to MetLife requesting short term disability benefits in early December 2003.  R. 197-200.  She reported that she was prevented from performing the duties of her job due to a nervous breakdown, physical collapse, acute panic attack, and anxiety.  R. 199.  Dr. Michelle Dostie, her primary care physician, reported that Emery's diagnosis was depression, that her expected return to work date was unknown, specified the medications that Emery was taking, and concluded that she was not able to work with job modifications or restrictions.  R. 199.

---

[1] According to the terms of the Plan, "Own Occupation" is defined as "the activity that you regularly perform and that serves as your source of income.  It is not limited to the specific position you held with your Employer.  It may be a similar activity that could be performed with
*(continued on next page)*

2

On December 12, 2003, MetLife approved Emery's claim from November 13, 2003 to January 23, 2004. R. 196. On January 28, 2004, MetLife authorized continued benefits through March 5, 2004. R. 184. MetLife notified Emery of the procedure for requesting an extension of benefits in the event that her disability extended beyond that date. R. 184.

On February 27, 2004, MetLife contacted Emery regarding her return to work plans. R. 86. Emery requested that Dr. Dostie receive another questionnaire because she said she was still experiencing numerous panic attacks throughout the day and was unsure whether she would be able to return to work on March 8, 2004.[2] Id. MetLife faxed this form, along with a request for Dr. Dostie's most recent evaluation including "the specifics with regard[ ] to the criteria met for the diagnoses you feel are preventing her from being able to return to work and the specific restrictions and limitations as a result of her condition(s) that preclude her from returning to work even on a part time basis." R. 87, 174. On March 8, MetLife received the completed questionnaire from Dr. Dostie dated March 2, 2004. R. 88, 178-79. The form stated that Emery had been diagnosed with depression and anxiety and that she had been prescribed Xanax and Effexor. In response to a question regarding which daily activities

---

your Employer or any other employer." R. 27.

[2] MetLife approved benefits through Friday, March 5, 2004. Since March 6, 2004, fell on a Saturday, realistically Emery's expected return to work date was Monday, March 8, 2004.

3

Emery *could and could not* perform, Dr. Dostie replied: "most ADLs."[3] R. 178. As the symptoms, deficits or functional impairments that prevented Emery from performing work related activities, Dr. Dostie listed stress-related anxiety, some agoraphobia and panic attacks. Id. She also stated that there had been some improvement in Emery's depression and that she should continue with her medications and counseling. Id.

MetLife also called Emery's therapist, Linda Gallion, to discuss symptoms preventing Emery from returning to work. Gallion, however, reported that she had not seen Emery since an office visit of December 16, 2003. R. 88. Gallion reported that before that date, she had seen Emery quite regularly. Following the December 16, 2003, visit, Emery cancelled one appointment then failed to appear for two more without further contact. R. 88, 149-51. As a result, Gallion had closed her file on Emery. R. 88, 124.

On March 23, 2004, MetLife informed Emery that she did not qualify for benefits beyond March 5, 2004. R. 172-73. The letter also informed Emery of her right to appeal the determination and the process for doing so.[4]

On April 28, 2004, Emery appealed the denial of her claim. R. 111-13. In support of her appeal she submitted letters and medical evaluations from her

---

[3] The acronym refers to activities of daily living. Dr. Dostie did not specify whether Emery could or could not perform most activities of daily living.

[4] Emery also called MetLife on March 31, 2004 following the denial of benefits, and she was
*(continued on next page)*

4

primary care physician, Dr. Dostie, and from her psychiatrist, Dr. Beverly Grimm. The letter from Dr. Dostie dated April 19, 2004, stated that she supported continued medical disability for Emery "due to her severe anxiety and depression exacerbated by work situations" and that she "support[s] her having long-term disability for the next 6 months." R. 114. She also enclosed office notes from visits through April 19, 2004, and a record of medications. R. 119, 156-62.

Dr. Grimm's letter dated April 20, 2004, stated that she began seeing Emery on March 1, 2004, and that she diagnosed her with Major Depression and Panic Disorder. R. 115. She wrote: "[a]t the present time Ms. Emery is not going to be able to engage in gainful employment. I anticipate that it will take up to 18 months before she is able to return to work in any capacity." Id. She also provided a psychiatric evaluation and medical progress notes from office visits through March 30, 2004. R. 125-27, 154-55. The March 1, 2004, psychiatric evaluation shows that Dr. Grimm increased Emery's dosage of Effexor to 225 mg per day and Amitriptyline to 50 mg at bedtime. R.127. She also decreased her dosage of Xanax to 1 mg three times per day. She wrote: "[t]he patient is going to try not to use Xanax unless she needs it, and hopefully the other medications will help her not have so many panic attacks, although right now she is not having them daily." Id. Dr. Grimm noted that Emery should return in one month and

---

informed how to appeal the determination. R. 89.

that she might consider therapy at that time. Id. The medical progress notes from Emery's March 30, 2004 visit state that her level of functioning was unchanged. R. 154. They also indicate that Dr. Grimm did not alter Emery's medications on this visit. R. 155. The "assessment" section notes "panic disorder now with agoraphobia"; Dr. Grimm's "working diagnosis" of Emery's condition did not change from the previous visit. R. 154-55.

MetLife submitted all the medical records to Dr. Lee H. Becker, an Independent Physician Consultant, Board Certified in Psychiatry. R. 92. On May 18, 2004, Dr. Becker submitted a six-page report, which concluded that "[t]he medical information reviewed does not support psychiatric impairments beyond 03/06/04 while in appropriate care and treatment." R. 108. The report went on to state:

> The documentation reviewed showed that the primary precipitant to leaving work and primary source of panic symptoms were related to work issues. The Claimant was not compliant with the mental health treatment plan which clearly noted an expectation of weekly psychotherapy sessions along with monthly psychiatric followup visits. The documentation around the time in question did not indicate specific and significant[] impairments in daily functioning due to the psychiatric condition. In addition, the mental status examinations around the time in question did not show significant impairments in thought processing or cognition and therefore no significant objective findings to support impairments. In fact, improvements had been noted until the Claimant was notified of denial of benefits. With denial of benefits, she then reported an increase in subjective symptoms. However, there were no significant medication changes made by the Psychiatrist, nor were there significant changes made in the treatment plan. Therefore, it did not appear that the subjectively

> reported symptoms were an indication of significant biologic regression requiring more intensive interventions. In fact, both the Psychotherapist and the Primary Care Clinician had noticed improvement in symptomology with the Claimant being away from work.

R. 108-09. By letter dated May 28, 2004, MetLife informed Emery that it had completed its review of the termination of her short term disability benefits beyond March 5, 2004, and that "the original determination [was] upheld upon appeal review." R. 101-03. Following the denial of her appeal, Emery filed this lawsuit.

### A. *Standard of Review*

The Supreme Court has held that under ERISA, a court must review a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co., v. Bruch, 489 U.S. 101, 115 (1989). According to the First Circuit:

> When . . . an ERISA plan gives the plan administrator discretionary authority to interpret the terms of the plan and to determine a claimant's eligibility for benefits, we will uphold the decision unless it is arbitrary, capricious, or an abuse of discretion. Under that standard, the decision "must be upheld if there is any reasonable basis for it." Stated in different terms, we will uphold an administrator's decision "if the decision was reasoned and supported by substantial evidence," meaning that the evidence "is reasonably sufficient to support a conclusion and contrary evidence does not make the decision unreasonable."

Morales-Alejandro v. Medical Card Sys., Inc., ___ F.3d ___, ___, 2007 U.S. App.

7

LEXIS 11422, *8-9 (1st Cir. May 16, 2007) (citations omitted).

I turn, therefore, to the Plan documents. Unfortunately, the manner in which the Administrative Record is compiled in this case makes it difficult to distinguish some of the plan documents one from another. Ordinarily, one would expect to find a Plan, a Summary Plan Description, and in the case of insured benefits, an insurance contract or Certificate of Insurance. The Administrative Record here does not reflect those neat divisions. The Index to the Administrative Record refers only to a "Certificate of Insurance," and refers to it as occupying pages 1 through 78 of the Administrative Record. In fact, the first page of the Administrative Record looks like the cover page of a Plan. It reads:

**YOUR EMPLOYEE BENEFIT PLAN**

**VENTIV HEALTH, INC.**

**STD AND LTD BENEFITS**

**METLIFE**

This page is followed by an Introduction (pp. i-ii, R. 2-3), a Certificate of Insurance (pp. iii-xiii, R. 4-14) and a Table of Contents (pp. xiv-xv, R. 15-16). The Table of Contents lists a section titled "Plan Highlights," that runs from pages 1-6 of this document (R. 18-23). The opening paragraph of "Plan Highlights" states that it is

> a summary of your Short Term Disability and Long Term Disability Benefits and provisions. See the rest of your Certificate for more information. It is important to read the rest of your Certificate. It describes your benefits as well as any exclusions and limitations that apply to these benefits.

Arguably, that paragraph tells us that "Plan Highlights" is the Summary Plan Description, and that the Certificate of Insurance is the actual Plan. That interpretation is confirmed by page i, (R. 2). It begins: "We are pleased to present you with a Certificate of Insurance for group disability insurance. This Certificate states your benefits . . . ." Likewise, page iii, the opening page of the Certificate of Insurance (R. 4), states in the first paragraph: "This Certificate describes the benefits under the Plan in effect as of January 1, 2003." The same page states that "[r]eference to "This Plan" means that part of the Employer's plan of employee benefits that is insured by MetLife." R. 4. For all these reasons, I treat the Certificate as part of the Plan.

Importantly for this case, the Certificate states in the second paragraph:

> MetLife *in its discretion has authority to interpret* the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate and any Amendments.

R. 4 (emphasis added).

Likewise, pages 72-74 of the Administrative Record make clear that MetLife determines claims for disability benefits, and that MetLife resolves appeals.[5]

Page 74 of the Administrative Record closes:

---

[5] Under the "Method of Payment" section, the language of the Plan makes clear that benefits will be paid only after MetLife determines that a claimant is disabled. R. 59. In addition, the ERISA Information portion of the Plan establishes that claims for disability benefits under the Plan are to be submitted to MetLife and then "MetLife will review your claim and notify you of its decision to approve or deny your claim." R. 72. It further provides that "[i]f MetLife denies your claim, you may appeal the decision. . . . You must submit your appeal to Metlife. . . . MetLife will conduct a
*(continued on next page)*

> In carrying out their respective responsibilities under the Plan, the Plan Administrator [Ventiv Health, Inc.] and other Plan fiduciaries shall have *discretionary authority to interpret the terms of the Plan and to determine eligibility* for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

R. 74 (emphasis added).[6]  Finally, page 75 states under the heading "STATEMENT OF ERISA RIGHTS":

> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

Although these Plan documents could have been drafted (or organized) more clearly, the foregoing makes clear beyond dispute that MetLife is assigned discretion to interpret coverage and to determine eligibility for insured disability benefits.  MetLife is not the Plan Administrator and is not a "named fiduciary" within the meaning of ERISA, but it is a fiduciary under both the Plan language I

---

full and fair review of your claim" and "notify you in writing of its final decision. . . ."  R. 73.
[6] Confusingly, page 63 of the Administrative Record states: "THIS IS THE END OF THE CERTIFICATE.  THE FOLLOWING IS ADDITIONAL INFORMATION."  The status of this "additional information" is left unstated.  However, it clearly is part of the Plan or a Summary Plan Description.  By the time we get to page 70 of the Administrative Record, we are given "ERISA INFORMATION," including the name of the Plan, the name of the Plan Administrator (Ventiv Health, Inc.) the employer identification number, the "'Type of Administration' (The above listed benefits are insured by Metropolitan Life Insurance Company, ("MetLife").)," and provisions for service of process: for "disputes arising under the Plan," service of legal process is to be made on Ventiv Health, Inc.; "[f]or disputes arising under those portions of the Plan insured by MetLife,
*(continued on next page)*

have quoted and under ERISA, 29 U.S.C. § 1002(21)(A),[7] with resulting fiduciary discretion to construe terms and determine eligibility.[8]  It is true, as Emery argues, that ERISA permits a plan instrument to provide expressly "for named fiduciaries to designate persons other than the named fiduciaries to carry out fiduciary responsibilities . . . under the plan."  29 U.S.C. §1105(c)(1).  That statutory permission for later delegation, however, does not prohibit the plan documents themselves from assigning discretionary authority, as they do here.[9]

---

service of legal process may be made upon MetLife . . . ."

[7] "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002 (21)(A).

[8] The First Circuit has recognized that ERISA's fiduciary duty provisions extend to "functional fiduciaries—persons who act as fiduciaries (though not explicitly denominated as such) by performing at least one of the several enumerated functions with respect to a plan." Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 18 (1st Cir. 1998).  "The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets." Id. (internal parenthetical omitted).

[9] The plaintiff cites a First Circuit case, Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580 (1st Cir. 1993), in support of her argument for *de novo* review.  In Rodriguez-Abreu, the Plan did not grant the Plan Administrator (the employer's Corporate Human Resources Executive) discretionary authority to review claims. It did grant such authority to "the Named Fiduciaries or their delegates."  But in that case, an executive vice president of the employer made the decision denying benefits and denying review.  He was neither a Named Fiduciary nor a delegee of a Named Fiduciary.  According to the First Circuit, the claim that he was acting as the delegee of a Named Fiduciary "fails for lack of evidence." 986 F.2d at 584.  All the defendant had to support its position that he was acting as a delegee was the fact that the executive vice president's letter used the pronoun "we" rather than "I" in response to the final request.  Here, by contrast, the Plan documents explicitly grant discretion to MetLife. The plaintiff also cites a case from this District, Davidson v. Liberty Mutual Ins. Co., 998 F. Supp. 1 (D. Me. 1998).  In Davidson, the Plan Administrator had discretionary authority and there was no provision in the Plan for delegation. Nevertheless, the Plan Administrator delegated its discretion to a corporate subsidiary.  Because there was no provision for such a delegation, the court applied *de novo* review.  998 F. Supp. at 8-9.  Here, by contrast, there is explicit provision for discretionary authority on the part of MetLife.

11

Under <u>Firestone</u> and <u>Morales-Alejandro</u>, I conclude that the deferential standard of review applies.

### B. Denial of Benefits

MetLife's final denial of benefits stated:

> The physician consultant reviewed the medical information we have received and stated that the March 5, 2004 progress note from Dr. Dostie indicated that you were still having panic attacks however there was no description of the frequency or duration of the attacks. The note indicated that you had not been seeing your counselor and were seeing your Psychiatrist once a month. The note also indicated that you were in no acute distress and appeared less anxious. Insight and judgement [sic], orientation, memory, mood and affect were noted to be normal. There was no indication of impairments in daily functioning due to your psychiatric condition and there was no indication of medication changes. Your mental status exam did not show significant impairments in thought processing or cognition and there was no significant objective findings to support an impairment. Improvements had been noted until you were notified of the denial of your benefits. However there were no significant medication changes or significant changes made in your treatment plan at that time.
>
> As discussed above, we have not been provided with sufficient medical documentation of a continuing disability that would prevent you from performing the duties of your own occupation beyond March 5, 2004, which is a requirement of your plan. Therefore, the original claim determination was appropriate.

R. 102.

I conclude that MetLife's decision to deny disability benefits is not arbitrary, capricious, or an abuse of discretion. Instead, it is reasoned and supported by substantial evidence.

First, I reject Emery's argument that MetLife had the burden to show "substantial evidence of vocationally relevant medical improvement." Pl.'s Mot. for J. on the Admin. R. at 12. This is not a case where long term benefits had been awarded, then terminated, as in Colby v. UnumProvident, 328 F. Supp.2d 186 (D. Ma. 2004), the case Emery cites for her burden shifting argument. Emery received benefits with a cutoff date of March 5, 2004. Emery's award does not change the standard of review or shift the burden of proving disability thereafter from Emery to MetLife. That would create a perverse disincentive against making such awards.[10] In reviewing the denial of benefits, I treat Emery as bearing the burden of proof throughout.

MetLife received the following medical information from Emery: reports, records and office notes from her treating physician Dr. Dostie; records from the Kennebec Valley Mental Health Center that include an intake clinical assessment, progress notes and a discharge summary from her counselor Gallion and a psychiatric evaluation and progress notes from her psychiatrist Dr. Grimm. That evidence was mixed. In the context of the appeal, both Dr. Dostie and Dr. Grimm wrote conclusory letters supporting continuation of benefits, but MetLife

---

[10] I also reject Emery's argument that MetLife unreasonably required objective evidence. Although Dr. Becker referred to the paucity of objective evidence, there is no indication that MetLife required such evidence as a precondition to benefits. Moreover, this is not a case like Cook v. Liberty Life Ins. Co. of Boston, 320 F.3d 1 (1st Cir. 2003), which said that Chronic Fatigue Syndrome is a condition that does not have objective evidence and therefore objective evidence *(continued on next page)*

13

was not bound by such letters, not unusual from treating doctors. There was also specific information from the doctors, a mixture of subjective reports (supportive of Emery's claim); objective observations (ambiguous or not supportive); the record of prescribed medications (supportive but to the degree they alleviated the condition, not supportive); statements of work restrictions; and statements of improvements (and a setback when benefits were denied). The report from counselor Gallion revealed that Emery had not availed herself of those counseling services after mid-December, 2003.

MetLife engaged an Independent Physician Consultant to review all of Emery's medical information.[11] This Consultant, Dr. Becker, noted that the medical records reflected improvement in Emery's condition with medication and treatment (until she lost her disability benefits when, although her subjective symptoms increased, she received no significant medication or treatment changes); that Emery missed several therapy sessions, resulting in her discharge from the Kennebec Valley Mental Health Clinic therapy program; that Emery's treating physicians' objective descriptions were less severe than her subjective complaints; and that many of her symptoms related to her job, a position she subsequently lost, with an eventual improvement in symptomatology. R. 104-09.

---

cannot be required.

[11] Emery makes a vague suggestion that Dr. Becker might not be independent. See Pl.'s Mot. for J. on the Admin. R. at 20; Reply Mem. at 20. There is no evidence in the Administrative Record, *(continued on next page)*

14

Moreover, her most recent treating physicians' letters lacked either specific details or specific symptoms targeted. Emery disagrees with Dr. Becker's assessment and, as in most cases, a different view could be taken, but MetLife was entitled to use Dr. Becker's assessment in making its decision. The combination of reports from Emery's treating physicians and counselor, along with the Becker assessment, are reasonably sufficient to support the conclusion that MetLife reached.[12] The conclusion is reasoned, and "contrary evidence does not make the decision unreasonable." Morales-Alejandro, 2007 U.S. App. LEXIS at *9.[13]

I conclude, therefore, that MetLife's decision denying short term benefits is properly supported in the Administrative Record under the deferential standard of review.

Emery agrees that "disability is defined in identical terms" for the relevant period of long term benefits. Pl.'s Mot. for J. on the Admin. R. at 5 n.2. Therefore, my affirming the denial of short term benefits applies equally to any

---

however, to support the charge.

[12] See, e.g., Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 215 (1st Cir. 2004) ("ERISA does not require plan administrators or reviewing courts to accord special deference to the opinions of treating physicians." See also Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician….").

[13] MetLife's motion to file surreply memorandum is **GRANTED** My conclusion is not affected by the Global Assessment of Functioning score that Emery raises for the first time in her Reply Memorandum. The score was not mentioned by her treating physicians nor by MetLife's independent consultant.

long term benefits claim.  I do not decide whether Emery actually applied for long term benefits.

Finally, I find that MetLife gave adequate notice of the reasons for its decision and what Emery needed to do to pursue her appeal.

## II.  CONCLUSION

Accordingly, the Clerk shall enter judgment for the defendant on the administrative record.

**SO ORDERED.**

**DATED THIS 13TH DAY OF JUNE, 2007**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

**U.S. DISTRICT COURT**
**DISTRICT OF MAINE (PORTLAND)**
**CIVIL DOCKET FOR CASE #: 2:06CV91**

| | | |
|---|---|---|
| **Sharon A. Emery,** | Represented By | **Jon Holder** |
| **Plaintiff** | | Holder & Grover |
| | | P.O. Box 238 |
| | | Ellsworth, ME 04605-0238 |
| | | (207) 664-0299 |
| | | email: holdergrover@downeast.net |

**v.**

| | | |
|---|---|---|
| **Metropolitan Life Insurance Company,** | Represented By | **Richard W. Mulhern** |
| | | Sulloway & Hollis |
| **Defendant** | | P.O. Box 7240 |
| | | Portland, ME 04112-7240 |
| | | (207) 253-5141 |
| | | email: rmulhern@sulloway.com |
| | | |
| | | **William D. Pandolph** |
| | | Sulloway & Hollis PLLC |
| | | P.O. Box 1256 |
| | | Concord, NH 03302-1256 |
| | | (603) 224-2341 |
| | | email: wpandolph@sulloway.com |